## GIBSON PALMER v. STATE.

No. A-10207.　March 1, 1944.

(146 P. 2d 592.)

Wimbish & Wimbish, of Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Gibson Palmer, was charged in the district court of Pontotoc county with the crime of manslaughter in the first degree, was tried, convicted and sentenced to serve four years in the State Penitentiary and has appealed.

Gibson Palmer, the defendant, was the owner and operator of the Broadway Buffet in the city of Ada. The deceased, W. M. Barringer, on March 4, 1939, and on April 5, 1939, had cashed checks at the defendant's place of business, drawn on Barringer's personal account at the Oklahoma State Bank of Ada. Payment on these checks was refused by the bank on account of insufficient funds. The defendant had tried unsuccessfully several times by conversations over the telephone with the deceased to collect the checks.

On July 18, 1939, the defendant received a telephone call from one J. O. Abney that the deceased was standing in front of Abney's store. The defendant took the checks and went to the front of Abney's store and there entered into a conversation with the deceased in an attempt to collect the two checks.

Roy Earles was talking to the deceased at the time the defendant approached. His testimony concerning what occurred on that occasion is as follows:

"Q. You may state, as near as possible, Mr. Earles, the conversation had between these parties? A. Well, Mr. Gib Palmer walked up there and he had two checks in his

hand and he asked Mr. Barringer if he was going to pay those checks off and he said, 'No, I don't have the money' —that is just as near as I know now as to what was said— and he said, 'It looks like you could pay those checks off, they have been given now about three or four months and he told him that he didn't have the money and that man, Gib Palmer, then reached to get hold of him and they started scuffling and he said, 'Come go with me to the county attorney and I will turn you and the checks both over to the county attorney,' that is the best I know as to what they said and then they went scrambling on west and south of there. Q. Did Mr. Palmer reach to hit him or to get hold of him? A. He reached to get hold of him it looked to me like. Q. Where did he reach to get him? A. In the shirt bosom. Q. Will you demonstrate to the jury about where he reached to get hold of him? A. Right about there (indicating.) Q. What did Mr. Barringer do when Mr. Palmer took hold of his shirt? A. The best I could tell he butted against that glass right there. Q. Bumped back like that? A. Yes, pulling back. Q. What did Mr. Barringer do then? A. His feet then were both down on the concrete and he went to dodging backwards and they were going west and south right back out that way. (indicating) * * * Q. Will you state to the jury what the two men were doing as they went along there? A. The only thing I can state is that they were scuffling with one another, naturally like a man would if another man was going to take him some place and he didn't want him to. Q. Did Mr. Barringer swing at Mr. Palmer? A. Yes, sir. Q. Did Mr. Palmer still have hold of his shirt there when they got along there (indicating) as near as you could tell? A. Yes, sir, as near as I could tell. Q. Where did you go? A. I got back to about that mark right in there. (indicating) Q. Did you watch him closely—Mr. Barringer? A. It looked to me like he stumbled in that grass there and fell out into the street."

J. O. Abney testified that he heard a noise in front of his store and looked out and saw the defendant and the deceased slapping each other. That the scuffling started

on the north side of his store building and continued onto the west side. That after they got around to the west side of his building he could only see their feet. He saw the deceased fall at the curb and the witness called the ambulance.

Paul Anderson and Tom Cummings each testified that they were engaged in a conversation while they were standing on a street corner west of Abney's store. That their attention was first attracted to a scuffle by the bowl of a pipe coming out across the sidewalk. That they saw the deceased back up to the curb with his hands in front of his face trying to shield himself from some blows being struck by the defendant. They each testified that they saw defendant strike deceased two blows with his fist and that at the second lick the deceased fell to the pavement.

It was the theory of the state that the defendant struck the deceased with such force with his fist that the deceased sustained a fracture to his skull, resulting in his death. The information charged the defendant with the crime of manslaughter in the first degree and alleged that the defendant killed the deceased while the defendant was committing a misdemeanor, towit, assault and battery upon the deceased.

Four doctors testified concerning the injuries sustained by the deceased.

Dr. I. L. Cummings, brother-in-law of the deceased, testified that the deceased had a laceration in front of the left ear and eye; his nose was fractured, his left eye was black and blue and his face beaten up quite a bit. That deceased died from a fracture to the basal skull and hemorrhage of the brain. That his death was caused from a lick of some sort. That it could have been caused from a fall

on the curb or on a rock or it could have been caused from a side blow to the head.

The other three doctors testified on behalf of the defendant that they examined deceased at the Sugg Clinic. That the deceased had a laceration above the left ear and was bleeding from his nose and his ear. That X-rays were made and it was determined that deceased had a fractured skull. Each of these doctors testified that in his opinion the basal fracture sustained by the deceased could not have been caused by a blow from a man's fist. Each gave as his opinion that the blow was sustained by the head striking the pavement.

The defendant testified in his own behalf. His testimony did not differ materially from the testimony of Roy Earles. He stated that he was attempting to get the deceased to go with him to the county attorney's office to straighten out the checks and that a scuffle started and some licks passed between them. That he grabbed hold of the deceased and was going to take him to the county attorney's office, but that deceased jerked loose, started to run, hung his feet in the sand and fell against the curb. Defendant admitted striking the deceased two or three times but denied that he hit him with enough force to knock him down.

Counsel who represented the defendant before this court did not participate in the trial of the case. Many of the questions they now urge for a reversal of the case were matters which were not properly preserved in the record by saving an exception to the action of the lower court in his rulings thereon in the trial. The record discloses that no exceptions were taken to the admission or exclusion of evidence, no exceptions were taken to any of the instructions given by the court, and no special instructions were requested.

It is well settled that errors to which no exceptions are taken will not be considered on appeal unless they are jurisdictional or of a fundamental character. The appellate court indulges a presumption that if error had been called to the attention of the lower court by objection at the time and in the motion for a new trial, the lower court would have corrected the error.

Fundamental errors which will be considered on appeal, even without objection or exception taken during the trial of a case, are those which go to the foundation of the case, or take from the defendant a right which was essential to his defense. Where it appears, and justice requires, this court will consider them whether or not exceptions are taken in the court below. Morrison v. State, 37 Okla. Cr. 359, 258 P. 1050; Tyler v. State, 74 Okla. Cr. 39, 122 P. 2d 826.

After the verdict of the jury was returned. present counsel for defendant were employed and the errors now complained of were presented in a motion for a new trial and were incorporated in the petition in error attached to the case-made filed herein.

It is insisted that the court committed fundamental error in certain of the instructions which were given and also committed fundamental error in failing to fully and properly instruct the jury in that the trial court failed to submit to the jury the question of excusable homicide, or the question of manslaughter in the second degree, or of the offense of assault and battery.

Complaint is especially made of instruction No. 4. This instruction is as follows:

"Homicide is the killing of one human being by another, and is manslaughter in the first degree in the following cases:

"When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

Instruction No. 4 is in the language of the statute and, of course, was proper to be given. The argument of the defendant is directed, not at the giving of this instruction, but it is at the failure of the court to define the term "misdemeanor". Nowhere in the court's instructions is a misdemeanor defined and nowhere are they instructed as to what constitutes a battery. The state's whole case is based upon the theory that the homicide was perpetrated by the defendant without a design to effect death, but while he was engaged in the commission of a misdemeanor. Instruction No. 4, standing alone, without further advising the jury as to what constituted a misdemeanor, left the jury to determine that question.

In the case of Roddie v. State, 19 Okla. Cr. 63, 198 P. 342, 343, this court held:

"An instruction is erroneous, although correct as an abstract proposition of law, if it leaves the jury in doubt or uncertainty as to how it should be applied to the evidence."

It is the duty of the court to fully and fairly instruct the jury as to all matters of law which he thinks are necessary for their information in giving their verdict. A jury should never be left to determine questions of law. It was

fundamental error for the court to instruct the jury that homicide is manslaughter in the first degree when perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor, without further instructing them as to what constitutes a misdemeanor and without defining assault and battery, which was the misdemeanor relied upon by the prosecution.

Title 21 O. S. 1941 § 731 provides:

"Homicide is excusable in the following cases: * * *

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

In the case of Johnson v. State, 59 Okla. Cr. 283, 58 P. 2d 156, in construing this statute in a similar case, it was held:

"In prosecution for manslaughter in first degree by striking decedent on head with fist, refusal of instruction that homicide is excusable when committed by accident and misfortune, in heat of passion, upon sudden and sufficient provocation, or upon sudden combat, provided no dangerous weapon is used and killing is not done in cruel and unusual manner, held error."

See, also, Mead v. State, 65 Okla. Cr. 86, 83 P. 2d 404.

In the case of People v. Hampton, 96 Cal. App. 157, 273 P. 854, 855, it was held in construing the statute of California, which is in identical language with that of Oklahoma, as follows:

"Where evidence showed that defendant struck deceased when reprimanded for his conduct, and knocked deceased down, causing his head to strike sidewalk, from which he died, defendant was entitled to have submitted to

jury question whether homicide was excusable when committed in heat of passion on sudden provocation or on sudden combat, within Pen. Code, § 195."

Title 21 O. S. 1941 § 716 provides:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

The defendant had a right to have the issue of manslaughter in the second degree and also that of assault and battery submitted to the jury. If the jury had believed the statement of the accused as to how the death of the deceased occurred, he would probably have been convicted of nothing more than assault and battery. Under the testimony of defendant he admitted striking the deceased two or three times, but claimed that the deceased had jerked away from him and started to flee and stumbled and fell, striking his head on the pavement, resulting in his death. He would at least have been guilty of assault and battery by reason of striking deceased before he jerked away and fled. The jury might not have found defendant guilty of assault and battery, but under the information filed herein and the evidence, it was an included offense and as such was one of the issues properly to be submitted to the jury for their determination.

The testimony is undisputed that there was grass and sand between the sidewalk and the street. It is further undisputed that the deceased fell from the grass or sidewalk to the street, striking his head against the pavement. The testimony of the witnesses is conflicting as to whether the deceased tripped and fell or whether he was knocked down by the defendant. After considering the testimony of the physicians, one is impelled to the conclusion that

the fracture occurred by reason of the force of the fall against the pavement and not from the impact of defendant's fist against the skull. Under such circumstances the issue of manslaughter in the second degree should have been submitted.

In the case of Miles v. State, 41 Okla. Cr. 283, 273 P. 284, 286, it is stated:

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury have been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside."

In the case of Moore v. State, 48 Okla. Cr. 106, 289 P. 788, it is held:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not."

It therefore follows by reason of the foregoing that the judgment of the district court of Pontotoc county should be reversed and remanded for further proceedings consistent with this opinion.

It is so ordered.

BAREFOOT, J., concurs. DOYLE, J., not participating.